1  PHILLIP A. TALBERT
   United States Attorney
2  DAVID W. SPENCER
   EMILY G. SAUVAGEAU
3  Assistant United States Attorney
   501 I Street, Suite 10-100
4  Sacramento, CA 95814
   Telephone: (916) 554-2700
5  Facsimile: (916) 554-2900

6

7  Attorneys for Plaintiff
   United States of America

8

9                    IN THE UNITED STATES DISTRICT COURT

10                   EASTERN DISTRICT OF CALIFORNIA

11  UNITED STATES OF AMERICA,              CASE NO. 2:19-CR-0091-DAD

12                 Plaintiff,              PLEA AGREEMENT

13         v.

14  JAMAINE DONTAE BARNES,

15                 Defendant.

16

17                        I.    **INTRODUCTION**

18      A.   **Scope of Agreement**

19          The Superseding Indictment in this case charges the defendant with violations of 21 U.S.C. § 848

20  – continuing criminal enterprise ("Count One"); 21 U.S.C. §§ 846, 841(a)(1) – conspiracy to

21  manufacture, distribute, and possess with intent to distribute fentanyl, at least 500 grams of a mixture or

22  substance containing a detectable amount of methamphetamine, heroin, and U-47700 ("Count Two"); 21

23  U.S.C. §§ 846, 841(a)(1), and 813 – conspiracy to manufacture, distribute, and possess with intent to

24  distribute *N*-ethylpenylone and U-47700, controlled substance analogues ("Count Three"); 21 U.S.C.

25  § 841(a)(1) – distribution of fentanyl ("Count Four"); 21 U.S.C. § 841(a)(1) – possession with intent to

26  distribute at least 50 grams of a mixture or substance containing a detectable amount of

27  methamphetamine ("Counts Five and Six"); 21 U.S.C. § 841(a)(1) – distribution of at least 50 grams of

28  a mixture or substance containing a detectable amount of methamphetamine ("Count Seven"); 21 U.S.C.

PLEA AGREEMENT                            1

§ 841(a)(1) – distribution of at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine ("Count Eight"); 21 U.S.C. § 841(a)(1) – possession with intent to distribute at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine ("Count Nine"); 21 U.S.C. § 860a – possession with intent to distribute methamphetamine on a premises where children are present ("Count Ten"); 18 U.S.C. § 924(c)(1)(A) – possession of a firearm in furtherance of a drug trafficking crime ("Counts Eleven and Twelve"); 21 U.S.C. § 841(a)(1) – manufacture of methamphetamine ("Count Fourteen"); 21 U.S.C. § 860a – manufacture of methamphetamine on a premises where children resided ("Count Fifteen"); 18 U.S.C. § 922(g)(1) – felon in possession of a firearm ("Count Eighteen"); and 18 U.S.C § 1956(a)(2)(A) – money laundering ("Counts Twenty-One through Twenty-Four").  This document contains the complete plea agreement between the United States Attorney's Office for the Eastern District of California (the "government") and the defendant regarding this case.  This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

**B.    <u>Rule 11(c)(1)(C) Agreement to a Specific Sentencing Range</u>**

The government and the defendant agree that a specific sentencing range is appropriate in this case.  Specifically, the parties agree that the defendant should be sentenced to a term of incarceration of no less than 25 years in prison and up to life in prison.  Consequently, this plea agreement is being offered to the Court pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.

Under the provisions of Rule 11(c)(3), the Court may accept or reject the plea agreement, or may defer its decision as to the acceptance or rejection until there has been an opportunity to consider the presentence report.  If the Court accepts the plea agreement, the Court will inform the defendant that it will embody in the judgment and sentence the disposition provided for in this plea agreement.  In addition, the parties agree that, if the Court does not accept the plea agreement, the government has the right to withdraw from the plea agreement.

If the Court rejects this plea agreement, the Court shall so advise the defendant and the government, allow the defendant and the government the opportunity to withdraw from the plea

agreement, and advise the defendant that if he persists in a guilty plea the disposition of the case may be less favorable to him than is contemplated by this plea agreement.

## II.     DEFENDANT'S OBLIGATIONS

### A.     Guilty Plea

The defendant will plead guilty to Count One, continuing criminal enterprise, in violation of 21 U.S.C. § 848; Count Four, distribution of fentanyl, in violation of 21 U.S.C. § 841(a)(1); Counts Five, Six, and Nine, possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1); Counts Seven and Eight, distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1); Count Fifteen, manufacture of methamphetamine on a premises where children resided, in violation of 21 U.S.C. § 860a; Count Eighteen, felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); and Counts Twenty-One through Twenty-Four, money laundering, in violation of 18 U.S.C § 1956(a)(2)(A).

The defendant agrees that he is in fact guilty of these charges and that the facts set forth in the Factual Basis For Plea attached hereto as Exhibit A are accurate.

The defendant agrees that this plea agreement will be filed with the Court and become a part of the record of the case.  The defendant understands and agrees that he will not be allowed to withdraw his plea should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by him in signing this Agreement, including the factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea pursuant to this Agreement.  The defendant waives any rights under Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, to the extent that these rules are inconsistent with this paragraph or with this Agreement generally.

The defendant acknowledges that the crime to which he is pleading guilty is listed in 18 U.S.C. § 3143(a)(2), and agrees that he will remain in custody upon the entry of his plea.

### B.     Special Assessment

The defendant agrees to pay a special assessment of $100 per count ($1,300) at the time of sentencing by delivering a check or money order payable to the United States District Court to the

1   United States Probation Office immediately before the sentencing hearing.  The defendant understands

2   that this plea agreement is voidable at the option of the government if he fails to pay the assessment

3   prior to that hearing.  If the defendant is unable to pay the special assessment at the time of sentencing,

4   he agrees to earn the money to pay the assessment, if necessary by participating in the Inmate Financial

5   Responsibility Program.

6          **C.**     **Defendant's Violation of Plea Agreement or Withdrawal of Plea**

7          If the defendant, violates this plea agreement in any way, withdraws his plea, or tries to withdraw

8   his plea, this plea agreement is voidable at the option of the government.  The government will no longer

9   be bound by its representations to the defendant concerning the limits on criminal prosecution and

10  sentencing as set forth herein.  One way a defendant violates the plea agreement is to commit any crime

11  or provide any statement or testimony which proves to be knowingly false, misleading, or materially

12  incomplete.  Any post-plea conduct by a defendant constituting obstruction of justice will also be a

13  violation of the agreement.  The determination whether the defendant has violated the plea agreement

14  shall be decided under a probable cause standard.

15         If the defendant violates the plea agreement, withdraws his plea, or tries to withdraw his plea, the

16  government shall have the right: (1) to prosecute the defendant on any of the counts to which he pleaded

17  guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea agreement; and (3) to file

18  any new charges that would otherwise be barred by this plea agreement.  The defendant shall thereafter

19  be subject to prosecution for any federal criminal violation of which the government has knowledge,

20  including perjury, false statements, and obstruction of justice.  The decision to pursue any or all of these

21  options is solely in the discretion of the United States Attorney's Office.

22         By signing this plea agreement, the defendant agrees to waive any objections, motions, and

23  defenses that the defendant might have to the government's decision to exercise the options stated in the

24  previous paragraph.  Any prosecutions that are not time-barred by the applicable statute of limitations as

25  of the date of this plea agreement may be commenced in accordance with this paragraph,

26  notwithstanding the expiration of the statute of limitations between the signing of this plea agreement

27  and the commencement of any such prosecutions.  The defendant agrees not to raise any objections

28  based on the passage of time with respect to such counts including, but not limited to, any statutes of

1  limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth

2  Amendment to any counts that were not time-barred as of the date of this plea agreement.

3       In addition: (1) all statements made by the defendant to the government or other designated law

4  enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal,

5  whether before or after this plea agreement, shall be admissible in evidence in any criminal, civil, or

6  administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no

7  claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal

8  Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by

9  the defendant before or after this plea agreement, or any leads derived therefrom, should be suppressed.

10  By signing this plea agreement, the defendant waives any and all rights in the foregoing respects.

### III.   THE GOVERNMENT'S OBLIGATIONS

#### A.   Dismissals

13       If the Court accepts this plea agreement under Rule 11(c)(1)(C), the government agrees to move,

14  at the time of sentencing, to dismiss without prejudice the remaining counts in the pending Superseding

15  Indictment.  The government also agrees not to reinstate any dismissed count except if this agreement is

16  voided as set forth herein, or as provided in II.C (Defendant's Violation of Plea Agreement), and VII.B

17  (Waiver of Appeal) herein.

#### B.   Recommendations

##### 1.   Incarceration Range

20       Consistent with the sentencing range offered pursuant to Rule 11(c)(1)(C), the government may

21  recommend a sentence of no less than 25 years, up to life in prison.  The parties agree that the

22  government may respond fully to any arguments by the defendant in connection with sentencing.

##### 2.   Acceptance of Responsibility

24       The government will recommend a two-level reduction in the computation of defendant's

25  offense level if he clearly demonstrates acceptance of responsibility for his conduct as defined in

26  U.S.S.G. § 3E1.1(a).  This includes the defendant meeting with and assisting the probation officer in the

27  preparation of the pre-sentence report, being truthful and candid with the probation officer, and not

28  otherwise engaging in conduct that constitutes obstruction of justice within the meaning of U.S.S.G

§ 3C1.1, either in the preparation of the pre-sentence report or during the sentencing proceeding.  The government will not recommend an additional one-point reduction under U.S.S.G. § 3E1.1(b), as the defendant's acceptance of responsibility did not "permit[] the government to avoid preparing for trial and permit[] the government and the court to allocate their resources efficiently." *See* U.S.S.G. § 3E1.1(b).

### C.   Use of Information for Sentencing

The government is free to provide full and accurate information to the Court and the United States Probation Office ("Probation"), including answering any inquiries made by the Court and/or Probation, and rebutting any inaccurate statements or arguments by the defendant, his attorney, Probation, or the Court.  The defendant also understands and agrees that nothing in this Plea Agreement bars the government from defending on appeal or collateral review any sentence that the Court may impose.

### IV.   ELEMENTS OF THE OFFENSE

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offenses to which the defendant is pleading guilty:

As to Count One, continuing criminal enterprise, in violation of 21 U.S.C. § 848:

1.   Beginning on a date unknown but no later than September 27, 2015, and continuing through on or about May 16, 2019, the defendant committed one or more of the following violations:

    a.   conspiracy to manufacture, distribute, or possess with intent to distribute fentanyl, methamphetamine, heroin, or U-47700, as charged in Count Two;

    b.   conspiracy to manufacture, distribute, or possess with intent to distribute N-ethylpentylone or U-47700, controlled substance analogues, as charged in Count Three;

    c.   distribution of fentanyl, as charged in Count Four;

    d.   possession with intent to distribute methamphetamine, as charged in Counts Five, Six, and Nine;

    e.   distribution of methamphetamine, as charged in Counts Seven and Eight;

     f.   possession with intent to distribute methamphetamine on a premises where children were present, a charged in Count Ten;

     g.   manufacture of methamphetamine, as charged in Count Fourteen; or

     h.   manufacture of methamphetamine on a premises where children reside, as charged in Count Fifteen;

2. The violation was, or violations were, part of a series of three or more violations of the federal narcotics laws committed by the defendant over a definite period of time, with the jury unanimously finding that the defendant committed each of at least three such violations;

3. The defendant committed the series of violations together with five or more other persons. The government does not have to prove that all five or more of the other persons operated together at the same time, or that the defendant knew all of them;

4. The defendant acted as an organizer, supervisor, or manager of the five or more other persons; and

5. The defendant obtained substantial income or resources from the violations.

As to <u>Count Four</u>, distribution of fentanyl, in violation of 21 U.S.C. § 841(a)(1):

1. On or about October 19, 2018, the defendant knowingly distributed fentanyl; and

2. The defendant knew that it was fentanyl or some other federally controlled substance.

As to <u>Counts Five and Six</u>, possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1):

1. On or about the dates charged in the Superseding Indictment, the defendant knowingly possessed at least 50 grams of a mixture or substance containing a detectable amount of methamphetamine; and

2. The defendant possessed it with the intent to distribute it to another person.

As to <u>Count Seven</u>, distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1):

1. On or about May 9, 2019, the defendant knowingly distributed at least 50 grams of a mixture or substance containing a detectable amount of methamphetamine; and

2.      The defendant knew that it was methamphetamine or some other federally controlled substance.

As to <u>Count Eight</u>, distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1):

1.      On or about May 14, 2019, the defendant knowingly distributed at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine; and

2.      The defendant knew that it was methamphetamine or some other federally controlled substance.

As to <u>Count Nine</u>, possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1):

1.      On or about May 16, 2019, the defendant knowingly possessed at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine; and

2.      The defendant possessed it with the intent to distribute it to another person.

As to <u>Count Fifteen</u>, manufacture methamphetamine on premises where children resided, in violation of 21 U.S.C. § 860a:

1.      Beginning no later than on or about April 20, 2019, and continuing through on or about May 16, 2019, the defendant knowingly manufactured methamphetamine;

2.      The defendant knew that it was methamphetamine or some other federally controlled substance.

3.      The manufacture took place on premises in which an individual who was under the age of 18 resided.

As to <u>Count Eighteen</u>, felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1):

1.      On or about May 16, 2019, the defendant knowingly possessed a .40 caliber Ruger P94 handgun, with serial number 341-45374, a PLR-16 5.56mm KEL-TEC CNC INC firearm, with serial number PB590, or a BERSA Thunder .380 caliber handgun, with serial number 809050;

2.      The firearm had been transported from one state to another or between a foreign nation and the United States;

3.   At the time the defendant possessed the firearm, the defendant had been convicted of a crime punishable by imprisonment for a term exceeding one year; and

4.   At the time the defendant possessed the firearm, the defendant knew he had been convicted of a crime punishable by imprisonment for a term exceeding one year.

As to Counts Twenty-One through Twenty-Four, money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A):

1.   On or about the dates set forth below, the defendant transmitted or transferred money from a place in the United States to or through a place outside the United States; and

2.   The defendant acted with the intent to promote the carrying on of: (a) engaging in a continuing criminal enterprise, as alleged in Count One; (b) conspiracy to manufacture, distribute, or possess with intent to distribute fentanyl, methamphetamine, heroin, or U-47700, as alleged in Count Two; or (c) conspiracy to manufacture, distribute, or possess with intent to distribute N-ethylpentylone or U-47700, controlled substance analogues, as alleged in Count Three.

Count Twenty-One alleges that, on or about September 27, 2015, defendant Jamaine Barnes transmitted or transferred $595 from the United States to China in a transaction assigned Western Union Payment Number 5460400281. Count Twenty-Two alleges that, on or about November 10, 2015, defendant Jamaine Barnes transmitted or transferred $1,300 from the United States to China in a transaction assigned Western Union Payment Number 4043338446. Count Twenty-Three alleges that, on or about April 7, 2016, defendant Jamaine Barnes transmitted or transferred $350 from the United States to China in a transaction assigned Western Union Payment Number 6258970363. Count Twenty-Four alleges that, on or about April 18, 2016, defendant Jamaine Barnes transmitted or transferred $1,800 from the United States to China in a transaction assigned Western Union Payment Number 7187700496.

The defendant fully understands the nature and elements of the crimes charged in the Superseding Indictment to which he is pleading guilty, together with the possible defenses thereto, and has discussed them with his attorney.

## V.      MAXIMUM SENTENCE

### A.      Maximum Penalty

As to <u>Count One</u>, the maximum sentence that the Court can impose is imprisonment of at least twenty years and up to life, a fine of $2,000,000, a term of supervised release of up to five years, and a special assessment of $100.

As to <u>Count Four</u>, the maximum sentence that the Court can impose is imprisonment of up to twenty years, a fine of $1,00,000, a term of supervised release of at least three years and up to life, and a special assessment of $100.

As to each of <u>Counts Five, Six, and Seven</u>, the maximum sentence that the Court can impose is imprisonment of at least five and up to forty years, a fine of $5,000,000, a term of supervised release of at least four years and up to life, and a special assessment of $100.

As to each of <u>Counts Eight and Nine</u>, the maximum sentence that the Court can impose is imprisonment of at least ten years and up to life, a fine of $10,000,000, a term of supervised release of at least five years and up to life, and a special assessment of $100.

As to <u>Count Fifteen</u>, the maximum sentence that the Court can impose is imprisonment of up to twenty years, which shall run consecutive to any other sentence imposed; a fine of $250,000; a term of supervised release of three years; and a special assessment of $100.

As to <u>Count Eighteen</u>, the maximum sentence that the Court can impose is imprisonment of up to ten years, a fine of $250,000, a term of supervised release of three years, and a special assessment of $100.

As to each of <u>Counts Twenty-One through Twenty Four</u>, the maximum sentence that the Court can impose is imprisonment of up to twenty years; a fine of $500,000 or twice the value of the monetary instrument or funds involved, whichever is greater; a term of supervised release of three years; and a special assessment of $100.

In addition, the defendant may be ineligible for certain federal and/or state assistance and/or benefits, pursuant to 21 U.S.C. § 862.

**B.**     **Violations of Supervised Release**

The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve up to five years of additional imprisonment.

## VI.     SENTENCING DETERMINATION

If the Court accepts this plea agreement pursuant to Rule 11(c)(1)(C), the defendant understands that the Court must sentence him to a term of prison of not less than 25 years in prison and could impose a sentence of up to life in prison.

Under the provisions of Rule 11(c)(3), the Court may accept or reject the plea agreement, or may defer its decision as to the acceptance or rejection until there has been an opportunity to consider the presentence report.  If the Court accepts the plea agreement, the Court will inform the defendant that it will embody in the judgment and sentence the disposition provided for in this plea agreement.  In addition, the parties agree that, if the Court does not accept the plea agreement, the government has the right to withdraw from the plea agreement.

## VII.     WAIVERS

**A.**     **Waiver of Constitutional Rights**

The defendant understands that by pleading guilty he is waiving the following constitutional rights:  (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, constitutional challenges to the statutes of conviction, and other pretrial motions that have been filed or could be filed; (e) to subpoena witnesses to testify on his behalf; (f) to confront and cross-examine witnesses against him; and (g) not to be compelled to incriminate himself.

**B.**     **Waiver of Appeal and Collateral Attack**

The defendant understands that the law gives the defendant a right to appeal his guilty plea, conviction, and sentence.  If the Court accepts this plea agreement pursuant to Rule 11(c)(1)(C), the defendant agrees as part of his pleas, however, to give up the right to appeal any aspect of the guilty plea, conviction, and the sentence imposed in this case.  The defendant understands that this waiver

PLEA AGREEMENT

includes, but is not limited to, any and all constitutional and/or legal challenges to the defendant's conviction and guilty plea, including arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts attached to this agreement is insufficient to support the defendant's plea of guilty.

In addition, regardless of the sentence the defendant receives, if the Court accepts this plea agreement pursuant to Rule 11(c)(1)(C), the defendant also gives up any right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any aspect of the guilty plea, conviction, or sentence imposed in this case.

Notwithstanding the agreement in paragraph III.A (Dismissals) above that the government will move to dismiss counts against the defendant, if the defendant ever attempts to vacate his plea, dismiss the underlying charges, or modify or set aside his sentence on any of the counts to which he is pleading guilty, the government shall have the rights set forth in paragraph II.C (Defendant's Violation of Plea Agreement) herein.

## VIII.    ENTIRE PLEA AGREEMENT

Other than this plea agreement, no agreement, understanding, promise, or condition between the government and the defendant exists, nor will such agreement, understanding, promise, or condition exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and counsel for the United States.

# IX.   APPROVALS AND SIGNATURES

## A.   Defense Counsel

I have read this plea agreement and have discussed it fully with my client.  The plea agreement accurately and completely sets forth the entirety of the agreement.  I concur in my client's decision to plead guilty as set forth in this plea agreement.

Dated:   7/29/24

SHARI RUSK
JOHN BALAZS
Counsel for Defendant

## B.   Defendant

I have read this plea agreement and carefully reviewed every part of it with my attorney.  I understand it, and I voluntarily agree to it.  Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case.  No other promises or inducements have been made to me, other than those contained in this plea agreement.  In addition, no one has threatened or forced me in any way to enter into this plea agreement.  Finally, I am satisfied with the representation of my attorney in this case.

Dated:   7/29/24

JAMAINE DONTAE BARNES,
Defendant

## C.   Attorney for the United States

I accept and agree to this plea agreement on behalf of the government.

Dated:   7/30/24

PHILLIP A. TALBERT
United States Attorney

By:

DAVID W. SPENCER
EMILY G. SAUVAGEAU
Assistant United States Attorneys

**EXHIBIT "A"**
**Factual Basis for Plea**

If this matter proceeded to trial, the United States would establish the following facts beyond a reasonable doubt:

Beginning no later than September 27, 2015, and continuing through May 16, 2019, defendant Jamaine Dontate BARNES committed the following violations:

- conspiracy to manufacture, distribute, or possess with intent to distribute fentanyl, methamphetamine, heroin, or U-47700, as charged in Count Two of the Superseding Indictment;

- conspiracy to manufacture, distribute, or possess with intent to distribute N-ethylpentylone or U-47700, controlled substance analogues, as charged in Count Three of the Superseding Indictment;

- distribution of fentanyl, as charged in Count Four of the Superseding Indictment;

- possession with intent to distribute methamphetamine, as charged in Counts Five, Six, and Nine of the Superseding Indictment;

- distribution of methamphetamine, as charged in Counts Seven and Eight of the Superseding Indictment;

- possession with intent to distribute methamphetamine on a premises where children were present, a charged in Count Ten of the Superseding Indictment;

- manufacture of methamphetamine, as charged in Count Fourteen of the Superseding Indictment; and

- manufacture of methamphetamine on a premises where children reside, as charged in Count Fifteen of the Superseding Indictment.

BARNES committed these violations as part of a series of three or more violations of the federal narcotics laws committed by BARNES over a definite period of time. BARNES committed the series of violations together with five or more other persons over whom he acted as an organizer, supervisor, and manager. BARNES obtained substantial income and resources from the violations.

As part of this series of violations, BARNES committed the following criminal acts:

### Pill Pressing at Johnesha Thompson's Residence in Stockton

From at least September 2015 through November 2017, BARNES used the Stockton home of co-defendant Johnesha THOMPSON to manufacture purported ecstasy pills and counterfeit pharmaceutical pills using pill press machines. BARNES mixed the ingredients together for making the pills and either pressed the pills himself or directed subordinates, including Thompson, to press the pills for him. BARNES mixed methamphetamine, *N*-ethylpentylone, and other stimulants into the purported ecstasy pills. BARNES mixed fentanyl, furanyl fentanyl, U-47700 and other opioids into the counterfeit

1  pharmaceutical pills.  Throughout this time period, Jamaine Barnes had numerous packages containing
2  pill presses, numerous pill dies, controlled substances (including at least four shipments containing a
   total of more than 4.5 kilograms of raw *N*-ethylpentylone and more than 2.5 kilograms of raw U-47700),
3  and other materials for manufacturing pills shipped to Thompson's home or to other addresses he
4  controlled.  Throughout this time period, BARNES and his subordinates regularly pressed pills in 1,000-
   pill quantities at Thompson's home for distribution to his pill customers.

5       On November 16, 2017, Thompson was arrested in Arizona following a traffic stop in which she
6  was found in possession of more than 1,000 purported ecstasy pills.  Lab testing revealed the pills
   weighed 339 grams net weight (excluding packaging) and contained *N*-ethylpentylone.  Two smaller
7  baggies seized from Thompson, one of pills and one of powder, were each found to contain both
   methamphetamine and *N*-ethylpentylone, weighing 2.1 and 4.8 grams net weight respectively.
8  BARNES admits that he was responsible for the manufacture and distribution of these pills.

9  ## BARNES Directed Illegal Drug Payments to China to Obtain Pill Press Materials and Parts (Counts 21-24)

10

11      BARNES regularly obtained pill press materials from Chinese suppliers that he had shipped to
   locations he controlled in Stockton, CA.  Sometimes Jamaine Barnes paid these suppliers himself; on
12 other occasions, he directed co-conspirators to do so.  PayPal and Western Union financial records show
   payments for many of these items through Western Union money transfers and PayPal transactions.
13 Four of the transfers through Western Union (Counts 21-24) were as follows:

14
| Count | Date | WU Payment # | Amount | Sender | Sender Location | Recipient Location | Items Purchased |
|-------|------|-------------|--------|--------|-----------------|--------------------|-----------------|
| 21 | 9/27/15 | 5460400281 | $595 | Jael Barnes (BARNES' wife) | Stockton | China | 3 pill dies (counterfeit pharma pills) |
| 22 | 11/10/15 | 4043338446 | $1300 | Calvin Crosby | Stockton | China | 6 pill dies (counterfeit pharma pills) |
| 23 | 4/7/2016 | 6258970363 | $350 | Calvin Crosby | Stockton | China | 2 pill dies (counterfeit pharma pills) |
| 24 | 4/18/2016 | 7187700496 | $1800 | Calvin Crosby | Stockton | China | 1 kg *N*-ethylpentylone |

20      BARNES' emails reveal that he made each of these purchases from the suppliers in China.
21 BARNES directed Crosby and Jael Barnes to send the money to China for these purchases on his behalf.

22 ## BARNES Supplied Edison Reese with Heroin Pills

23      On March 29, 2018, surveillance watched BARNES meet with a pill customer named Edison
   Reese.  Reese got into BARNES' vehicle and they drove to two locations associated with BARNES and
24 his pill trafficking operation.  Barnes then dropped off Reese at his vehicle.  Law enforcement stopped
25 Reese and seized 111 heroin-laced pills (which were pressed to appear to be hydrocodone or "Norco"
   pills).  BARNES admits that he was responsible for the manufacture and distribution of these pills.

26 ## Jeremy Barnett Distributed BARNES' Fentanyl Pills on October 19, 2018 (Count 4)

27
28      On October 19, 2018, co-defendant Jeremy Barnett sold 301 counterfeit oxycodone pills to a
   buyer who turned out to be a confidential source (the "CS").  Lab testing revealed that these pills

weighed 37 grams net weight and contained fentanyl, heroin, and methamphetamine.  BARNES admits that he was responsible for the manufacture and distribution of these pills.

Text messages on Barnett's phone revealed additional pill sales that he made on behalf of BARNES.

**Manufacture of Meth-Laced Pills at 1139 Parma Road, Stockton in April-May 2019; Seizure of 1,000 of BARNES' Meth-Laced Pills from Tashawn Dickerson on April 26, 2019 (Counts 5, 15)**

On April 20, 2019, DEA agents intercepted a series of calls between BARNES and co-defendant Vincent Patterson pursuant to a court-authorized federal wiretap on BARNES' cell phone.  These intercepted calls, coupled with surveillance observations, reveal that Patterson was pressing purported ecstasy/MDMA pills (referred to as "smackers") at 1139 Parma Road, Stockton, CA, the house of co-defendant Kadrena Watts.  BARNES directed Patterson to press these pills at Watts' residence.  BARNES also acted as an organizer, supervisor, and manager of Watts, who allowed BARNES and his subordinates to use her residence to press pills in exchange for small payments.

On April 26 and 30, BARNES went to 1139 Parma Road to obtain purported ecstasy/MDMA pills, based on intercepted calls and surveillance observations.  On April 26, 2019, law enforcement arrested co-defendant Tashawn Dickerson with 1,029 purported ecstasy/MDMA pills that were delivered to him from 1139 Parma Road.  The pills contained methamphetamine and weighed 449.7 grams net weight.  BARNES admits that he was responsible for the manufacture and distribution of these pills.

On April 30, 2019, BARNES went to 1139 Parma Road to pick up a bag of another 1,000 purported ecstasy/MDMA pills from Watts.

On May 16, 2019, agents executed a federal search warrant at 1139 Parma Road.  During the search, agents found leftover equipment and residue from the pill-pressing operation:  a large rotary mixer machine, a blender with residue, a machine part with residue, a heat seal machine covered in a thin layer of white powder, multiple plastic containers and baggies with residue, packaging materials, several prescription bottles, small bottles containing colored powders, and two loose pills.  One of the pills appeared identical to those seized from Dickerson on April 26.  Laboratory testing of some of the residue showed it contained methamphetamine.  Throughout the time BARNES used Watts' home to press meth-laced pills, multiple children under the age of 18 lived there.

**Manufacture of Pills at 723 Bedlow Drive, Stockton (Jamar Barnes' Residence)**

On May 7, 2019, a series of intercepted phone calls revealed that, at BARNES' direction, Patterson went to the home of BARNES' twin brother, co-defendant Jamar Barnes (723 Bedlow Drive, Stockton, CA), to press pills.  The calls further revealed that, while Patterson and Jamar Barnes were pressing the pills, BARNES stopped by the house and instructed Patterson to bring him 500 pills out of the larger batch they were pressing.

On May 11, 2019, additional intercepted calls and GPS ping data for Patterson's cell phone revealed that Patterson was again pressing pills at 723 Bedlow Drive, this time with BARNES.

On May 16, 2019, agents executed a federal search warrant at 723 Bedlow Drive. Agents found a pill press machine at the residence. Agents also found several plastic baggies in the bathroom toilet containing a large amount of pills and powdery substances. The pills were purported ecstasy/MDMA pills and appeared identical to the pills at 1139 Parma Road and seized from co-defendant Dickerson, as well as other pills seized during the investigation (discussed below). The blue and red powdery substances matched the pills except they were not pressed into pill form. One bag contained a powdery substance that weighed 578.4 grams net weight and contained methamphetamine; another bag contained 101 purported ecstasy/MDMA pills that contained methamphetamine, weighing 36.8 grams net weight; a third bag contained 114 purported ecstasy/MDMA pills that contained methamphetamine, weighing 58.6 grams net weight; and a fourth bag contained 46 purported ecstasy/MDMA pills that contained methamphetamine, weighing 22.6 grams net weight. Agents also found in the toilet a baggie containing a brown powdery substance that contained furanyl fentanyl and weighed 13.1 grams net weight. Powdery residue on the pill press machine was also found to contain methamphetamine.

### BARNES Directed Patterson to Deliver 500 Meth-Laced Pills to the Post Office on May 8, 2019 for Lamont Thibodeaux (Count 6)

In a series of intercepted calls and texts, BARNES agreed to sell pills to co-defendant Lamont Thibodeaux by shipping them to Thibodeaux in Houston, Texas. On May 8, 2019, Barnes sent a photo of the package and its tracking number to Thibodeaux. Agents seized the package and searched it pursuant to a federal search warrant. Inside were approximately 500 purported ecstasy/MDMA tablets that appeared identical to other seized pills. The pills contained methamphetamine and weighed approximately 238 grams. Surveillance footage from the Post Office in Stockton showed that Patterson shipped the parcel that contained the pills. BARNES admits that he was responsible for the manufacture and distribution of these pills.

### Wiley Sold 1,000 Meth-Laced Pills to the CS on Behalf of BARNES on May 9, 2019 (Count 7)

On May 9, 2019, the CS purchased pills from Wiley at BARNES' music recording studio at 4410 N. Pershing Ave., Suite C-24, in Stockton, which BARNES used as a stash location and distribution center for counterfeit pharmaceutical pills and purported ecstasy pills in 2018 and 2019. When the CS first approached the studio, he said he was there to purchase studio time; however, Wiley refused to let him enter and told him to come back in a couple hours. Shortly thereafter, the CS saw BARNES arrive in the parking lot. The CS approached BARNES and explained what happened but said he was actually there to buy pills, not to make music. BARNES agreed and invited the CS to come up into the studio, where BARNES scolded Wiley for turning away "business." The CS agreed to buy a "boat" (1,000 pills) of purported ecstasy/MDMA pills ("smackers") for $1,200. The CS then left the studio and returned approximately a half hour later with money to buy the pills. Wiley then retrieved the bag of pills from inside a filing cabinet; the CS observed there were six to seven additional bags inside of the cabinet. DEA lab testing showed the pills weighed 420 grams net weight and contained methamphetamine. BARNES admits that he was responsible for the manufacture and distribution of these pills.

Also on May 9, 2019, Wiley sold 200 purported ecstasy pills to co-defendant Chevele Richardson at the studio, at BARNES' direction. Agents intercepted multiple wiretapped phone calls related to this purchase.

**Wiley Sold 3,000 Meth-Laced Pills to the CS on Behalf of BARNES on May 14, 2019 (Count 8)**

On May 14, 2019, the CS purchased approximately 3,000 purported ecstasy/MDMA pills from Wiley at BARNES' studio at 4410 N. Pershing Ave. DEA lab testing showed that these pills weighed 1,586 grams net weight and contained methamphetamine. BARNES admits that he was responsible for the manufacture and distribution of these pills.

During the time that the CS was inside the studio and while Wiley was preparing the bags of pills, Patterson entered the room and asked Wiley where the "usulamas" were, referring to firearms. Wiley directed Patterson to a filing cabinet, from which Patterson removed a .40 caliber handgun. Patterson left the room with the handgun. He returned and retrieved a firearm that resembled an AK-47 from the ceiling. Patterson took the firearms to the business suite (Suite # C-25) next door to BARNES' studio (Suite # C-24), which was also controlled by BARNES. Wiley explained to the CS that they were removing the guns because someone who was on an ankle monitor was coming to the studio to do a recording.

**Seizure of Pills, Manufacturing Materials, and Guns at BARNES' Studio on May 16, 2019
(Counts 9 and 18)**

Two days later, on May 16, 2019, at about 6:00 a.m., agents executed a federal search warrant at the studio. BARNES and Wiley were both sleeping at the studio. Entry agents encountered Wiley in the room where he had sold the pills to the CS and from which Patterson had removed the firearms two days earlier. Wiley was sitting on the floor, with his left hand concealed in the area between the sofa and a black filing cabinet, where agents later found a loaded assault rifle, a PLR-16 5.56mm KEL-TEC CNC INC firearm (serial # PB590). Agents quickly closed the space and detained Wiley. During the search of that room, agents found in a filing cabinet drawer:

- A clear plastic bag with about 1,300 white smacker pills containing methamphetamine and weighing 631.1 grams net weight.
- A clear bag with about 2,400 "norco" pills containing fentanyl and other substances, and weighing a total of more than 555 grams net weight.
- Light blue plastic bags with a white powder containing methamphetamine and weighing a total of 149 grams net weight, for mixing into counterfeit ecstasy pills.
- Two clear plastic bags with a white powder containing methamphetamine, for mixing into counterfeit ecstasy pills.
- A loaded .40 caliber Ruger P94 handgun, with serial number 341-45374.

Also in that room, on top of another filing cabinet, agents found a clear plastic bag with elongated tablets containing both fentanyl and methamphetamine and weighing 22.7 grams net weight and a glass jar with a plastic bag with white powder containing methamphetamine.

In another room of the studio next to where Wiley was arrested, agents found a black blender with a white powder residue containing methamphetamine, a black grinder with white powder residue containing methamphetamine, several multi-colored tablets containing methamphetamine, and a plastic bag with brown powder weighing 36.9 grams net weight and containing furanyl fentanyl and U-47700. Also in this room was a 5-kilogram bag of magnesium stearate and a 30-pound bucket of dicalcium

phosphate.  Magnesium stearate and dicalcium phosphate are both binding materials used in the manufacture of pills.

Agents also searched the suite next door to the studio (Suite C-25), which was also controlled by BARNES and was the location where Patterson stashed the guns on May 14 since someone with an ankle monitor was coming to the studio, as Wiley explained to the CS.  On top of a lighting ballast in the ceiling of Suite C-25, agents found a bag with 397 greenish pills weighing 113 grams net weight and containing methamphetamine.

BARNES admits that he was responsible for, and knowingly possessed, all of the pills, powders, manufacturing materials, and firearms found during the May 16, 2019, searches of his studio and Suite C-25 next door.

BARNES admits that the firearms were manufactured outside of California and thus were transported into California from out of state.  BARNES further admits that he had previously been convicted of a crime punishable by more than one year in prison and that he knew he had previously been convicted of a crime punishable by more than one year in prison.

### Seizure of Another Pill Press and Pill Dies Used by BARNES

On May 16, 2019, agents executed a federal search warrant at 4420 Janell Lane, Stockton, CA, the home of BARNES' mother.  At the house, agents found a pill press with BARNES' fingerprints and palm prints on it, an assortment of loose pills, and numerous pill dies for stamping counterfeit pills.  Agents also found indicia for BARNES and Jamar Barnes along with the pill dies.

### Seizure of BARNES' Meth Pills from Chevele Richardson

On April 25, 2019, co-defendant Chevele Richardson called BARNES to obtain 200 purported ecstasy pills.  Agents intercepted this phone call pursuant to a court-authorized wiretap.  The next day, BARNES told Richardson in another wiretapped call that he was trying to move the pills to his "studio" to provide them to Richardson but could not because of increased police presence in the area.  The "studio" referred to Barnes' music studio at 4410 N. Pershing Ave. in Stockton,.  The following day, April 27, Richardson told BARNES in a wiretapped call that he had wanted pills stamped with "scorpions" and that the purported ecstasy pills he had received were not the ones he wanted.  BARNES responded that "there's some at the studio."

On May 9, 2019, agents intercepted another wiretapped call from Richardson to BARNES.  Richardson asked BARNES to front him 500 purported ecstasy pills ("half a b" – *i.e.*, half a "boat," slang for 1,000 pills) for a potential customer.  BARNES responded that he only had 1,500 pills left and they agreed that Richardson would purchase 200 pills.  A little while later, Richardson went to BARNES' studio and obtained the 200 pills from Wiley.

The next day, on May 10, 2019, agents intercepted another wiretapped call from Richardson to BARNES.  Richardson agreed to purchase another 350 purported ecstasy pills from BARNES at the studio.

On May 16, 2019, agents searched Richardson's apartment.  Agents seized a total of approximately 290 "smacker" pills.  Lab testing found these pills to contain methamphetamine and to

weigh approximately 125 grams net weight.  BARNES admits that he was responsible for the manufacture and distribution of these pills.

I have reviewed the Factual Basis in Exhibit A and, as far as my own conduct is concerned, I adopt it as a true and correct statement of my conduct.

Dated:  7/29/24

JAMAINE DONTAE BARNES,
Defendant